UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | CRIMINAL NO._____ |
| | ) | 18 U.S.C. § 1001(a) |
| | ) | 18 U.S.C. § 1341 |
| v. | ) | 18 U.S.C. § 1503(a) |
| | ) | 18 U.S.C. § 1503(b)(3) |
| | ) | 18 U.S.C. § 1956(h) |
| | ) | 18 U.S.C. § 1957 |
| | ) | 18 U.S.C. § 2 |
| | ) | 18 U.S.C. § 981(a)(1)(C) |
| | ) | 18 U.S.C. § 982(a)(1) |
| | ) | 28 U.S.C. § 2461(c) |
| **JOHN FITZGERALD O'CONNOR, JR.** | ) | |
| **MICHAEL D. SHAVO** | ) | INDICTMENT |

COUNT 1

CONSPIRACY

THE GRAND JURY CHARGES:

INTRODUCTION

1.    Crane Co. is a diversified manufacturer of highly engineered products, operating in the following business segments: aerospace and electronics, fluid handling, controls, composite materials and merchandising systems.

2.    On or about October 31, 2006, Crane Merchandising Systems ("Crane"), a division of Crane Co., purchased from Whirlpool the outstanding shares of Dixie Narco (DN), a company doing business in Williston, South Carolina. DN is a company engaged in the can and bottle vending industry.

1

3.     Cass Information Systems, Inc. ("Cass") is a company doing business in St. Louis, Missouri, which acts as the third party payor for DN regarding all freight costs and expenses.

4.     Beginning in or about January 1992 and continuing through in or around January 2007, William J. Trier, II, ("Trier") was employed by DN in the Logistics Department in Williston, South Carolina as the Director of Physical Distribution. In or about 2000, Trier served as the Director of Logistics until he was terminated in January 2007.

5.     The Logistics Department at DN was responsible for the shipment of freight manufactured by DN throughout the United States. As Director of Logistics, Trier was responsible for selecting shipping companies to perform shipping services for DN, for negotiating all the freight carrier contracts and rates, and for providing all freight carrier information to Cass.

6.     Trier used his position as Director of Logistics at DN to embezzle company funds. Specifically, Trier created two fictitious freight shipping companies, "Maxxon Logistics and Associates" ("Maxxon") and "BTI Transport Group" a/k/a "BTI Group" ("BTI Group"). Trier submitted fraudulent freight invoices and bills of lading on behalf of Maxxon and BTI Group to Cass, disguising the fact that these companies were fictitious and representing that they had performed freight shipping services for DN.

7.     Trier caused false invoices of Maxxon and BTI Group to be paid by Cass.

8.     Monies paid to Maxxon and BTI Group were then deposited into two bank accounts opened and controlled by Trier at First Citizens Bank in Aiken, South Carolina in the names of "Maxxon Logistics and Associates" and "BTI Group".

2

9.      The embezzled monies were then used by Trier to purchase investment accounts, vehicles, and other personal property for his own use, benefit and enjoyment. Trier also invested in several real estate investment/development companies by himself and with others, including but not limited to: Minwood Plantation, LLC; Minwood Farms, LLC; Pine Bay Properties, LLC; and Lake Forest Investors, LLC.

10.     In the course of this scheme, Trier embezzled approximately $5,200,000.00 from DN.

11.     In January 2007, Trier was terminated from DN.  Soon after leaving DN, Trier learned that DN was conducting an internal investigation into his conduct related to the expenses paid in the Logistics Department for shipping costs. Trier was aware that the investigation would inevitably uncover his embezzlement.

12.     In or around February 2007, Trier contacted attorney JH, regarding legal representation.  JH and attorney BH were hired by Trier for a fee of $150,000 in or around March 2007. The legal fee was split between JH, BH and GS, each receiving $50,000.

13.     On or around March 8, 2007, JH, BH and GS met with Trier to discuss his situation. During this meeting, Trier explained his embezzlement scheme in detail. Trier described the method by which he embezzled the funds from DN, the length and the scope of his illegal activities, and the fact that he acquired assets with the stolen funds.

14.     In or around March 2007, JH contacted attorney **JOHN FITZGERALD O'CONNOR, JR.** regarding Trier.

15.     In or around April 2007, **JOHN FITZGERALD O'CONNOR, JR.** was also hired by Trier for a fee of $110,000.  In or around April 2007, **JOHN FITZGERALD**

3

**O'CONNOR, JR.** enlisted the assistance of his associate attorney, **MICHAEL D. SHAVO.**

16.    In or around April 2007, **JOHN FITZGERALD O'CONNOR, JR.** and JH met with Trier. During this meeting, Trier again explained his embezzlement scheme in detail. Trier described the method by which he embezzled the funds from DN, the length and the scope of his illegal activities, and the assets he acquired with the stolen funds.

17.    Trier was advised by **JOHN FITZGERALD O'CONNOR, JR.** and **MICHAEL D. SHAVO,** with the knowledge and assistance of JH, to invest proceeds of his illegal activities through financial transactions in order to protect his assets from the Internal Revenue Service, other Federal authorities, Crane Co., and its corporate predecessors.

18.    The VeXTRA Plan is an offshore tax scheme.    Specifically, **JOHN FITZGERALD O'CONNOR, JR.** devised a plan to protect Trier's assets utilizing the VeXTRA Plan which would establish United States shell companies that would transfer assets acquired from the embezzled funds into a US Virgin Islands offshore LLC. All entities associated with the VeXTRA plan would be placed in the nominee names of Trier's relatives, AT and DT. Trier was instructed to liquidate all of his assets and place them into the VeXTRA plan.

19.    Trier was further advised by **JOHN FITZGERALD O'CONNOR, JR.** and **MICHAEL D. SHAVO** that under the VeXTRA plan, his funds would initially be placed in a US Company they would create and name "AMOX Company, LLC" ("AMOX"),

4

which would be owned and managed by DT and/or AT. The funds placed in AMOX would then be passed through a series of independently owned entities and eventually placed in a US Virgin Islands LLC in which a member of Trier's family would be a common member. Each of these entities would be paid a fee from a portion of the funds invested for the right to participate in the plan and/or for services.

20.     Trier was further advised by **JOHN FITZGERALD O'CONNOR, JR.** and **MICHAEL D. SHAVO** that after his funds were placed in AMOX, the funds would then be paid to a company named "AKA Benefits Consultants, Inc." ("AKA") in Puerto Rico. The VeXTRA plan purports that AKA is a Professional Employee Organization ("PEO") that provides personnel management services for the executive staff of AMOX. In fact, AMOX does not have an executive staff because it is a shell company which provides no services and has no assets.

21.     AKA has no physical assets and did not provide any services for AMOX. AKA's sole function was to pass the invested VeXTRA funds to Alliance Management Partners ("AMP") and Advanced Planning Group ("APG") as described in the plan. AKA maintains a post office box and bank accounts in Puerto Rico which transfer funds invested by the various clients in VeXTRA to AMP and APG. AKA is paid a fee of 1% of the investment amount or a flat fee of $2,500, whichever is greater, to transfer the funds.

22.     Trier was further advised by **JOHN FITZGERALD O'CONNOR, JR.** and **MICHAEL D. SHAVO** that AKA would pay 4.5% of the funds invested to AMP and 95.5% of the funds would be passed to APG. APG would charge a 5.5% fee of the total investment from the funds it received and would pass the remaining 90% of the funds

it received to a company named Executive Benefit Group ("EBG"). EBG would then loan 100% of the funds it receives in the form of a capital contribution to a US Virgin Island company named MAXVEX, LLC ("MAXVEX"). AT is required to make a 5% capital contribution and becomes a common member stockholder of MAXVEX. MAXVEX would then purchase life insurance policies and bonds in Trier family members' names. MAXVEX would then borrow funds from the life insurance policies and bonds. These borrowed funds by MAXVEX would be returned as a tax free distribution to AT or Trier. The sole purpose of MAXVEX was to hold the investments and to make nontaxable distributions to AT or Trier. There would be no expectation of repayment of the distributions by Trier or his family members.

## THE CONSPIRACY

Beginning at a time unknown to the Grand Jury, but from at least in or around February 2007 and continuing up to the date of this Indictment in the District of South Carolina, **JOHN FITZGERALD O'CONNOR, JR.,  MICHAEL D. SHAVO,** JH, Trier and others both known and unknown to the grand jury, knowingly and willfully did combine, conspire, agree together and have tacit understanding with each other and with various other persons, both known and unknown to the grand jury, to launder the proceeds of illegal activity, that is, to conduct and attempt to conduct financial transactions and monetary transactions which in fact involved the proceeds of mail  fraud, a specified unlawful activity, (A) with the intent to promote the carrying on of the aforesaid specified unlawful activity, and (B) with knowledge that:    (1) the financial transactions represented the proceeds of some form of unlawful activity; and (2) the transactions

6

were designed, in whole and in part, to conceal and disguise the nature, the location, the source, the ownership, and the control of the proceeds of specified unlawful activity, in violation of Title 18, United States Code, Sections 1956(a)(1)(A)(i), and(a)(1)(B)(i).

In order to advance the purposes of the conspiracy and to accomplish the objects thereof, the following overt acts and other acts were performed by members of the conspiracy in the District of South Carolina:

<u>OVERT ACTS</u>

1.    In or around March 2007 and continuing until the date of this Indictment, **JOHN FITZGERALD O'CONNOR, JR.,  MICHAEL D. SHAVO,** JH, Trier and others both known and unknown to the grand jury, held meetings to devise a plan to fraudulently liquidate assets and transfer monies owned and controlled by Trier to shell corporations they would create in the United States and abroad which would be owned and controlled by AT and  DT.

2.    On or about March 8, 2007, JH, BH, GS and others both known and unknown to the grand jury, met with Trier for the purpose of discussing the fraud he had committed on DN and the state of his finances.  During this meeting, Trier explained his embezzlement scheme in detail.  Trier described the method by which he embezzled the funds from DN, the length and the scope of his illegal activities, and the fact that he had acquired assets with the stolen funds.

3.    On or about March 9, 2007, JH deposited a $50,000 check from one of Trier's investment accounts which contained fraudulent proceeds in his attorney trust account.

4.      On or about March 14, 2007, JH received in his attorney trust account a $100,000 wire transfer from Trier's UBS investment account which contained fraudulent proceeds.

5.      On or about March 22, 2007, per the instructions of JH, GS met with Trier to analyze the amount of money stolen by him, to review fraudulent tax returns filed by him, and to summarize the state of his finances and investments.

6.      On or about April 4, 2007, **JOHN FITZGERALD O'CONNOR, JR.**, JH and GS held a meeting.  During this meeting they discussed a plan to liquidate and transfer the assets of Trier.

7.      On or about April 5, 2007, JH deposited a $110,000 check from one of Trier's Charles Schwab investment accounts which contained fraudulent proceeds in his attorney trust account.  The purpose of the check was to retain **JOHN FITZGERALD O'CONNOR, JR.**

8.      On or about April 5, 2007, **JOHN FITZGERALD O'CONNOR, JR.** engaged the services of an accounting firm hereinafter referred to as BB&B to prepare the following: a 2006 tax return; amended tax returns for the years 1999 through 2005; and an asset statement.  The accounting firm was instructed to claim income for the fictitious companies Maxxon and BTI Group as "consulting income" on Schedule C of the tax returns.

9.      On or about April 9, 2007, **JOHN FITZGERALD O'CONNOR, JR.** deposited in the trust account of the O'Connor Law Firm two checks totaling $110,000 from JH, as a retainer for **JOHN FITZGERALD O'CONNOR, JR.'s** representation of

Trier. A check for $90,000 was deposited into the O'Connor Law Firm escrow account and designated for "William J. Trier-tax matters". A check for $20,000 was deposited into the O'Connor Law Firm escrow account and designated for "William J. Trier-tax matters-accountants".

10.    On or about April 9, 2007, **JOHN FITZGERALD O'CONNOR, JR.** made a $6,000 payment from the O'Connor Law Firm trust account to BB&B for the preparation of Trier's 2006 tax return.

11.    On or about April 10, 2007, **JOHN FITZGERALD O'CONNOR, JR.** and **MICHAEL D. SHAVO** caused a shell corporation known as MAXVEX, LLC, to be organized in the United States Virgin Islands for the purpose of concealing assets of Trier. The registered agent was the Virgin Islands Title and Trust Company.

12.    On or about April 11, 2007, **JOHN FITZGERALD O'CONNOR, JR.** and **MICHAEL D. SHAVO** caused a shell corporation known as "Maxxon, LLC" to be organized as a Delaware limited liability corporation for the purpose of concealing assets of Trier.

13.    On or about April 12, 2007,  **JOHN FITZGERALD O'CONNOR, JR.** and **MICHAEL D. SHAVO,**  with the knowledge and assistance of JH, formed a shell corporation "Ohio Tree, LLC", in South Carolina. AT was named the "organizer" of Ohio Tree, LLC.

14.    On or about April 15, 2007, **JOHN FITZGERALD O'CONNOR, JR.**, and **MICHAEL D. SHAVO** caused Trier to make the following payments for his 2006

personal tax returns which fraudulently claimed that Maxxon and BTI Group provided consulting services:

| Date of Payment: | Check Number: | Payable to: | Amount of Payment: |
|---|---|---|---|
| 4/16/2007 | 140 | SC Dept of Revenue | $38,125.00 |
| 4/16/2007 | 142 | SC Dept of Revenue | $2,500.00 |
| 4/16/2007 | 139 | United States Treasury | $221,908.00 |
| 4/16/2007 | 141 | United States Treasury | $11,250.00 |

15.     On or about April 13, 2007, at the direction of **JOHN FITZGERALD O'CONNOR, JR.**, Trier obtained a $250,000 line of credit on real property he owned located at 156 Hunters Run, Aiken, South Carolina. This property had been purchased, in part, with proceeds from Trier's illegal activities.

16.     On or about April 23, 2007, **JOHN FITZGERALD O'CONNOR, JR.** and **MICHAEL D. SHAVO** caused fraudulent amended tax returns to be prepared by BB&B for the years 1999 through 2006. The amended tax returns represented on Schedule C that the income Trier received from Maxxon and BTI Group was legitimate income received for the performance of consulting services.

17.     On or about April 24, 2007, at the direction of **JOHN FITZGERALD O'CONNOR, JR.** and **MICHAEL D. SHAVO,** Durable General Powers of Attorney were executed by Trier and other family members..

18.     On or about April 25, 2007, **JOHN FITZGERALD O'CONNOR, JR.** and **MICHAEL D. SHAVO** met for the purpose of discussing the liquidation and transfer of the assets of Trier into a shell corporation they would create and entitle "AMOX Company, LLC".

19.     On or about April 27, 2007, **JOHN FITZGERALD O'CONNOR, JR.,** and **MICHAEL D. SHAVO** caused an asset statement of Trier to be prepared by the accounting firm of BB & B.

20.     On or about May 1, 2007, **JOHN FITZGERALD O'CONNOR, JR.** and **MICHAEL D. SHAVO** prepared VeXTRA engagement letters for AT and DT.

21.     On or about May 3, 2007, **JOHN FITZGERALD O'CONNOR, JR.,** **MICHAEL D. SHAVO,** JH and GS met for the purpose of discussing the liquidation and transfer of the assets of Trier into AMOX Company, LLC.  Trier's assets, which had been identified in the asset statement prepared by BB&B, were specifically discussed in this meeting.

22.     On or about May 8, 2007, at the direction of **JOHN FITZGERALD O'CONNOR, JR.,** **MICHAEL D. SHAVO** dissolved the corporate entity known as Maxxon, LLC because the name was too closely associated with Trier's fraudulent company Maxxon Logistics, LLC.

23.     On or about May 8, 2007, at the direction of **JOHN FITZGERALD O'CONNOR, JR.** and **MICHAEL D. SHAVO,** AT paid the O'Connor Law Firm $20,000 to become a member of the VeXTRA plan.  The payment was in the form of a Regions Bank check which was drawn on a line of credit acquired using fraudulent proceeds.

24.     On or about May 8, 2007, at the direction of **JOHN FITZGERALD O'CONNOR, JR.** and **MICHAEL D. SHAVO,** AT paid the O'Connor Law Firm $20,000 for DT to become a member of the VeXTRA plan.  The payment was in the form of a

Regions Bank check which was drawn on a line of credit acquired using fraudulent proceeds.

25.    On or about May 10, 2007, **JOHN FITZGERALD O'CONNOR, JR.** and **MICHAEL D. SHAVO** caused a letter to be sent through the United States mail from Inc. Plan, USA, to DT containing a Certificate of Formation for AMOX Company, LLC.

26.    On or about May 10, 2007, **JOHN FITZGERALD O'CONNOR, JR.** and **MICHAEL D. SHAVO** caused a check dated May 8, 2007 in the amount of $2,800 to be sent through the United States mail from the O'Connor Law Firm to a law firm in the U.S. Virgin Islands.

27.    On or about May 15, 2007, **JOHN FITZGERALD O'CONNOR, JR.** and **MICHAEL D. SHAVO**, formed Normeon Company, LLC, to "manage" the business of AMOX Company, LLC.  DT was named the President of AMOX Company, LLC and **MICHAEL D. SHAVO** was listed as the registered agent.

28.    On or about May 17, 2007, at the direction of **JOHN FITZGERALD O'CONNOR, JR.** and **MICHAEL D. SHAVO**, DT opened a Bank of America account in the name of AMOX Company, LLC.

29.    On or about May 22, 2007, **JOHN FITZGERALD O'CONNOR, JR.** and **MICHAEL D. SHAVO** caused $3,000 to be paid from the trust account of the O'Connor Law Firm to BB&B for alleged "tax planning".

30.    On or about May 23, 2007, DT deposited $207,500.00 into the bank account of AMOX Company, LLC at the direction of **JOHN FITZGERALD O'CONNOR, JR.** and **MICHAEL D. SHAVO**.

31.    On or about May 24, 2007,   **JOHN FITZGERALD O'CONNOR, JR.** and **MICHAEL D. SHAVO** caused an original Certificate of Cancellation for Maxxon Company, LLC to be sent through the United States mail from Inc. Plan, USA, of Wilmington, Delaware to AT in Aiken, South Carolina.

32.    On or about May 31, 2007, **JOHN FITZGERALD O'CONNOR, JR.** and **MICHAEL D. SHAVO** caused the mailing of an AKA Consultants' Agreement to DT and directed him to read, sign and return the agreement via the United States mail.  The AKA Consultants Agreement between AMOX and AKA prepared by the O'Connor Law Firm was executed by DT.  This document listed DT as an executive staff employee and falsely stated that his compensation was $75,000.

33.    On or about June 8, 2007, at the direction of **JOHN FITZGERALD O'CONNOR, JR.** and **MICHAEL D. SHAVO,** DT sent two checks through the United States mail to the O'Connor Law Firm in the amounts of $150,000 and $2,500 made payable to AKA Consultants, Inc.

34.    On or about June 11, 2007, at the direction of  **JOHN FITZGERALD O'CONNOR, JR.** and **MICHAEL D. SHAVO**, an agent of the O'Connor Law Firm mailed the two checks received in the mail from DT to AKA in Puerto Rico.

35.    On or about June 20, 2007, at the direction of  **JOHN FITZGERALD O'CONNOR, JR.** and **MICHAEL D. SHAVO,** Trier sold a trailer located at 377 Cardinal Road, in Barnwell, South Carolina, an asset of Minwood Plantation, for approximately $21,000 which had been purchased with fraudulent proceeds.

36.   On or about June 26, 2007, at the direction of **JOHN FITZGERALD O'CONNOR, JR.** and **MICHAEL D. SHAVO**, Trier transferred his entire interest in Pine Bay Properties, LLC, to AMOX Company, LLC.  Pine Bay Properties, LLC was funded by Trier in part with fraudulent proceeds.

37.   On or about June 27, 2007, **MICHAEL D. SHAVO** placed in the United States mail a "Capital Contribution Agreement" addressed to DT with instructions for him to read, sign and return to **MICHAEL D. SHAVO** via mail using the envelope he enclosed.

38.   On or about June 29, 2007, **MICHAEL D. SHAVO** issued 1,000 shares of Normeon Stock to DT.

39.   On or about July 2, 2007, at the direction of **JOHN FITZGERALD O'CONNOR, JR.** and **MICHAEL D. SHAVO,** Trier mailed a check in the approximate amount of $19,000 to DT from property sold by Trier.

40.   On or about July 9, 2007, at the direction of **JOHN FITZGERALD O'CONNOR, JR.** and **MICHAEL D. SHAVO**, DT mailed a check in the amount of $80,000 payable to the O'Connor Law Firm. On July 12, 2007, at the direction of **JOHN FITZGERALD O'CONNOR, JR.** and **MICHAEL D. SHAVO,** an agent of the O'Connor Law Firm mailed a check in the amount of $80,000 payable to AKA Consultants, Inc. to AKA.

41.   On or about July 18, 2007, a search warrant was executed on the O'Connor law firm as part of an investigation into VeXTRA.  Thereafter, on or about August 2, 2007, at the direction of **JOHN FITZGERALD O'CONNOR, JR.** and

14

**MICHAEL D. SHAVO**, an agent of the O'Connor Law Firm returned through the mail a check made payable to AKA Consultants, Inc., to DT. DT was instructed to rewrite the check, but to now make it payable to Sensim Management Group, LLC, U.S. Virgin Islands LLC, ("Sensim") and then express mail the check to a law firm in the U.S. Virgin Islands.

42.    On or about August 7, 2007, **JOHN FITZGERALD O'CONNOR, JR.** and **MICHAEL D. SHAVO** caused PA to write one check in the amount of $143,250 from an AKA bank account made payable to Sensim.

43.    On or about August 9, 2007, at the direction of **JOHN FITZGERALD O'CONNOR, JR.** and **MICHAEL D. SHAVO**, DT mailed a check in the amount of $80,000 payable to Sensim to the law firm in the U.S. Virgin Islands.

44.    On or about September 10, 2007, at the direction of **JOHN FITZGERALD O'CONNOR, JR.** and **MICHAEL D. SHAVO**, two checks totaling approximately $223,250 were deposited into a bank account held in the name of Sensim.

45.    On or about September 24, 2007, **JOHN FITZGERALD O'CONNOR, JR.** and **MICHAEL D. SHAVO** caused a wire transmission to be made from the bank account of Sensim to the Forbes/Hutton Financial Corp. Bank account at the Bank of Nova Scotia.

46.    On or about September 28, 2007 following the arrest of Trier and a search of his personal residence, at the direction of **JOHN FITZGERALD O'CONNOR, JR.,** documents related to Trier were placed in a safe deposit box and a storage shed to avoid discovery by law enforcement.

47.     On or about October 1, 2007, at the direction of **MICHAEL D. SHAVO**, DT signed and mailed an AMOX Company, LLC Assignment Agreement back to **MICHAEL D. SHAVO**.

All in violation of Title 18, United States Code, Section 1956(h).

## COUNTS 2-12

THE GRAND JURY FURTHER CHARGES:

1.    The allegations contained in Count 1 of this indictment are realleged and incorporated as if fully set forth herein, as setting forth a scheme and artifice to defraud.

2.    From in or around February 2007 until the date of this Indictment, in the District of South Carolina, the defendants **JOHN FITZGERALD O'CONNOR, JR.**, and **MICHAEL D. SHAVO**, knowingly and willfully did devise and intended to devise a scheme and artifice to defraud DN and Crane out of money and property by means of false and fraudulent pretenses.

3.    It was part of said scheme and artifice to defraud that the defendants devised a plan to continue the fraud initially perpertrated by Trier by liquidating, concealing, and transfering the assets of Trier which were obtained as a result of Trier's theft from DN and Crane.

4.    The defendants, **JOHN FITZGERALD O'CONNOR, JR.** and **MICHAEL D. SHAVO**, from February 2007 until the date of this Indictment, deprived DN and Crane of their right and ability to recover  $5,200,000 which had been stolen by Trier through the execution of the above described scheme and artifice to defraud.

### Use of the mail in furtherance of the scheme to defraud

5.    On or about the dates set forth below, in the District of South Carolina, the defendants, **JOHN FITZGERALD O'CONNOR, JR.** and **MICHAEL D. SHAVO**, as

17

principals, aiders and abettors, and as co- participants in jointly undertaken criminal activity, for the purpose of executing the aforesaid scheme and artifice to defraud, knowingly did cause to be delivered by mail according to the directions thereon, the below listed documents by the senders to the addressees as described below, to wit:

| Count | Date | Sender: | Addressee: | Document |
|-------|------|---------|------------|----------|
| 2 | 5/10/2007 | Inc. Plan USA Wilmington, Delaware | DT Athens, GA | Certificate of formation of AMOX Company, LLC |
| 3 | 5/24/2007 | Inc. Plan USA Wilmington, Delaware | AT Aiken, SC | Certificate of cancellation of Maxon Company, LLC |
| 4 | 5/31/2007 | TH Columbia, SC | DT Athens, GA | AKA Consulting, Inc. Agreement |
| 5 | 6/8/2007 | DT Athens, GA | O'Connor Law Firm, Columbia, SC | check #101 for $150,000 and check #102 for $2,500 payable to AKA Consultants, Inc. |
| 6 | 6/11/2007 | TH Columbia, SC | AKA Consultants, Inc., Puerto Rico | check #101 for $150,000 and check #102 for $2,500 payable to AKA Consultants, Inc. |
| 7 | 6/27/2007 | **MICHAEL D. SHAVO** Columbia, SC | DT Athens, GA | Capital Contribution Agreement |
| 8 | 7/2/2007 | William Trier Aiken, SC | DT Athens, GA | check # in the amount of $19,039 |
| 9 | 7/9/2007 | DT Athens, GA | O'Connor Law Firm Columbia, SC | Check #103 in the amount of $80,000 payable to AKA Consultants, Inc. |
| 10 | 8/2/2007 | TH Columbia, SC | DT Athens, GA | Check #103 in the amount of $80,000 payable to AKA Consultants, Inc. |

| Count | Date | Sender: | Addressee: | Document |
|-------|------|---------|------------|----------|
| 11 | 8/9/2007 | DT<br>Athens, GA | I&I law firm<br>US Virgin<br>Islands | Check #104 in the amount of $80,000 payable to Sensim Management Group, LLC |
| 12 | 10/1/2007 | DT<br>Athens, GA | **MICHAEL D. SHAVO**<br>Columbia, SC | AMOX Company, LLC Assignment Agreement |

All in violation of Title 18, United States Code, Section 1341 and Section 2.

## COUNT 13

THE GRAND JURY FURTHER CHARGES:

1.      The allegations contained in Count 1 of this indictment are realleged and incorporated as if fully set forth herein.

2.      On or about June 20, 2007, in the District of South Carolina and elsewhere, the Defendants, **JOHN FITZGERALD O'CONNOR, JR., and MICHAEL D. SHAVO,** as principals, aiders and abettors, and as co- participants in jointly undertaken criminal activity, did knowingly engage in a monetary transaction in criminally derived property of a value greater than $10,000.00, that is, the sale of an asset of Minwood Plantation - a single wide trailer located at 377 Cardinal Road, Barnwell, South Carolina, said property being derived from a specified unlawful activity, that is, mail fraud;

All in violation of Title 18, United States Code, Section 1957 and Section 2.

## COUNT 14

THE GRAND JURY FURTHER CHARGES:

1.      The allegations contained in Count 1 of this indictment are realleged and incorporated as if fully set forth herein.

2.      On or about April 13, 2007, in the District of South Carolina and elsewhere, the Defendants, **JOHN FITZGERALD O'CONNOR, JR. and MICHAEL D. SHAVO,** as principals, aiders and abettors, and as co- participants in jointly undertaken criminal activity, did knowingly engage in a monetary transaction in criminally derived property of a value greater than $10,000.00, that is, they caused a line of credit to be taken on real property located at 156 Hunters Run Drive, Aiken, South Carolina, said property being derived from a specified unlawful activity, that is, mail fraud;

All in violation of Title 18, United States Code, Section 1957 and Section 2.

## COUNT 15

THE GRAND JURY FURTHER CHARGES:

1.      The allegations contained in Count 1 of this indictment are realleged and incorporated as if fully set forth herein.

2.      On or about May 29, 2007, in the District of South Carolina and elsewhere, the Defendant, **JOHN FITZGERALD O'CONNOR, JR.,** as principal, aider and abettor, and as a co-participant in jointly undertaken criminal activity, did knowingly engage in a monetary transaction in criminally derived property of a value greater than $10,000.00, that is, he caused a wire transfer to be sent to MR from his escrow account, said property being derived from a specified unlawful activity, that is, mail fraud;

All in violation of Title 18, United States Code, Section 1957 and Section 2.

## COUNT 16

THE GRAND JURY FURTHER CHARGES:

1.    The allegations contained in Count 1of this indictment are realleged and incorporated as if fully set forth herein.

2.    That beginning in or about March 2007 and continuing until the date of this Indictment, in the District of South Carolina, **JOHN FITZGERALD O'CONNOR, JR.** knowingly, intentionally, and unlawfully did corruptly influence, obstruct and impede, and endeavor to influence, obstruct and impede the due administration of justice in that he caused and attempted to cause assets to be liquidated and concealed which constituted proceeds of illegal activities in an effort to impede an ongoing grand jury investigation into the illegal activities of William J. Trier, II;

In violation of Title 18, United States Code, Sections 1503(a) and 1503(b)(3) and Section 2.

23

## COUNT 17

## FALSE STATEMENTS

THE GRAND JURY FURTHER CHARGES:

1.    The allegations contained in Count 1 of this indictment are realleged and incorporated as if fully set forth herein.

2.    That on or about July 20, 2009, in the District of South Carolina, the defendant, **MICHAEL D. SHAVO**, in a matter within the jurisdiction of the executive branch of the government of the United States, did knowingly make materially false, fictitious and fraudulent statements and representations, knowing the same to be false, in that he made false statements to an FBI agent and other law enforcement personnel regarding his knowledge of the source of the money he transferred for William J. Trier, II;

In violation of Title 18, United States Code, Section 1001(a).

## FORFEITURE

1.    MAIL FRAUD:

A.    Upon conviction for one or more violations of Title 18, United States Code, Section 1341 (mail fraud), as charged in this Indictment, the Defendants, **JOHN FITZGERALD O'CONNOR, JR. and MICHAEL D. SHAVO**, shall forfeit to the United States any property constituting or derived from proceeds the Defendants obtained directly or indirectly as a result of such violations;

2.    MONEY LAUNDERING:

A.    Upon conviction for a violation of Title 18, United States Code, Sections 1956(h) and 1957 (money laundering), as charged in this Indictment, the Defendants, **JOHN FITZGERALD O'CONNOR, JR. and MICHAEL D. SHAVO** shall forfeit to the United States any property, real or personal, involved in such offense, or any property traceable to such property;

3.    PROPERTY:

A.    Property subject to forfeiture to the United States upon conviction of the Defendant for offenses charged in this Indictment includes, but is not limited to the following:

    (1)    Cash Proceeds / Personal Money Judgment:
A sum of money equal to all proceeds the Defendants obtained directly or indirectly as the result of the offenses charged in this Indictment, and equal to property involved in the money laundering offenses charged in this Indictment, or traceable to such property, that is, a minimum of $5,200,000 in United States currency;

    (2)    Bank Accounts/Investment Accounts:
Funds, interest and credits in banking, brokerage and investment accounts held by financial institutions for the benefit of the Defendants,

**JOHN FITZGERALD O'CONNOR, JR. and MICHAEL D. SHAVO**, and/or in which the Defendants have an interest, which include, but are not limited to the following:

a.    Bank of America
      Account # 000781840699
      Titled in the name of:John W. Harte Trust
      In re: Bill Trier Federal Dispute
      Approximate Balance: $150,000.00

b.    RBC Centura Bank, 701 Gervais Street, Suite 160, Columbia, SC 29201
      Account 410-0003610
      Titled in the name of: The O'Connor Law Firm, PLLC, RE: William Trier Dispute
      Approximate Balance: $110,000.00

c.    Bank of Nova Scotia, 44 King Street West, 1 Mezzanine, Tornonto, Ontario, M5H 1H1 Canada
      Titled in the name of: Forbes /Hutton Financial Group
      Account number: 300720030015
      Approximate Balance: $223,250

4.    <u>SUBSTITUTE ASSETS:</u>

A.    If any of the property described above as being subject to forfeiture, as a result of any act or omission of the Defendant –

(1)    cannot be located upon the exercise of due diligence;

(2)    has been transferred or sold to, or deposited with, a third person;

(3)    has been placed beyond the jurisdiction of the Court;

(4)    has been substantially diminished in value; or

(5)    has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p), as incorporated by 18 U.S.C. § 982(b)(1) and 28 U.S.C. § 2461(c), to seek

forfeiture of any other property of the said Defendant up to the value of the above described forfeitable property, including but not limited to the following property:

(1)    Real Property:

All right, title and interest of the Defendants, **JOHN FITZGERALD O'CONNOR, JR.** and **MICHAEL D. SHAVO** in and to certain real property, together with all improvements thereon and with all rights and easements appertaining, including, but not limited to the following:

a.    179 Heimatsweg Road
Chapin, South Carolina
Titled in the name of: **JOHN FITZGERALD O'CONNOR, JR.**

b.    7 Sportsman Drive
Pawleys Island, South Carolina
Titled in the name of: **JOHN FITZGERALD O'CONNOR, JR.**

c.    4017 Yale Avenue
Columbia, South Carolina
Titled in the name of: **MICHAEL D. SHAVO** and Kara L. Shavo

(2)    Businesses / Corporate / Partnership Interests:

Any and all right title and interest of **JOHN FITZGERALD O'CONNOR, JR. and MICHAEL D. SHAVO**, in and to business and/or partnership assets and corporate interests held in the name(s) of the following entities, including but not limited to, all monies, claims, interests and accounts receivable payable to or received by the following entities:

a.    O'Connor Investment Company
Columbia, South Carolina

(3)    Vehicles:

a.    2007 Toyota Prius
VIN #: JTDKB20U177584427
Titled in the name of: **MICHAEL D. SHAVO**
SC License Plate: EXZ329

b.    2004 Mercedes Benz, SL 500
VIN #: WDBSK75F14F071704
Titled in the name of: **JOHN FITZGERALD O'CONNOR, JR.**
SC License Plate: PURE5

    c.    2008 BMW, 750LI
            VIN #:WBHAN83538DT81497
            Titled in the name of: Jatana S. O'Connor
            SC License Plate: EUX901

Pursuant to Title 18, United States Code, Sections 981(a)(1)(C) and 982(a)(1),

and Title 28, United States Code, Section 2461(c).

A _____ *True* BILL

FOREPERSON

W. WALTER WILKINS (DBB)
UNITED STATES ATTORNEY